UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ROADWAY MOVING AND STORAGE, INC.
D/B/A ROADWAY MOVING, AND
ROADWAY MOVERS INC. D/B/A ROADWAY MOVING,

                    *Plaintiffs*,

-AGAINST-

ROADWAY MOVERS LLC AND WILLIAM RODRIGUEZ,

                    *Defendants*.
------------------------------------------------------------------------X

Case No.: _____

**COMPLAINT**

*(**JURY TRIAL DEMANDED**)*

Plaintiffs, by their attorneys Oved & Oved LLP, complaining of the Defendants, upon information and belief, allege as follows:

## PARTIES

1. Plaintiff Roadway Moving and Storage, Inc. d/b/a Roadway Moving ("RMS") is a New York corporation with a place of business at 845 Third Avenue, 6th Floor, New York, New York.

2. Plaintiff Roadway Movers Inc. d/b/a Roadway Moving ("RM") is a New York corporation with a place of business at 845 Third Avenue, 6th Floor, New York, New York (RMS and RM are collectively referred to as "Plaintiffs" or "Roadway Moving").

3. Defendant Roadway Movers LLC ("Fake Roadway") is a Florida limited liability company with a place of business at 50 N. Laura Street, Jacksonville, Florida.

4. William Rodriguez, is the managing member/principal of Fake Roadway and a resident of Florida (Fake Roadway and Mr. Rodriguez are collectively referred to as "Defendants").

## JURISDICTION & VENUE

5. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Plaintiffs' claims arise under provisions of the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.* (the "Lanham Act"), New York General Business Law §§ 133, 349, and 360, and the common law of the State of New York.

6. This Court has supplemental jurisdiction over any and all state law claims pursuant to 28 U.S.C. § 1367 because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.     Plaintiffs and the "Roadway Moving" Mark**

8. Plaintiffs have been exclusively using the mark "Roadway Moving" ("Plaintiffs' Mark") for over ten years.

9. Specifically, Plaintiffs began using the Roadway Moving mark in 2008, when Plaintiffs opened as a small moving company with two trailers, less than 10 employees, and one location in the Bronx.

10. Since then, Plaintiffs—under the helm of CEO Ross Sapir—have worked tirelessly over the past ten years to build their brand and have grown so exponentially that they now have approximately 25 trailers, 200 employees, and three locations in Manhattan, the Bronx, and Los Angeles.[1]

11. Today, Plaintiffs perform over 6,000 moves per year, including coast-to-coast and

---

[1] While at all relevant times doing business as "Roadway Moving," in or around October 2016, RMS transferred its licenses to RM, a newly-formed New York State corporation, which has continued doing business as Roadway Moving.

international moves.

12. Over the course of its decade in business, Roadway Moving has developed an impeccable reputation and have earned the Super Service Award for 2014-2017 from Angie's List, a five-star rating on Yelp.com with more than 1,115 reviews, and an A+ rating from the Better Business Bureau ("BBB"), among other accolades, as shown below:



13. Roadway Moving's A+ rating from the BBB is based on its 92% positive reviews:



14. Examples of Roadway Moving's recent rave reviews on Yelp include:

- "I would absolutely hire this company again for the next move. Also of note, the customer service side of Roadway was equally as great." – Emily R. from Brooklyn, NY, April 9, 2018.

- "All in all a great experience, and I will absolutely recommend Roadway to friends and family!" – Kate H. from Manhattan, NY, February 8, 2018.

- "I have already praised your firm to many and will continue to tell anyone who is moving from NYC they should contact Roadway. I couldn't believe all of the praise I read on Yelp at first, but after this experience, they truly merit 5 stars - or more!" – Marc C. from New York, NY, January 21, 2018.

- "Overall- best moving company I HAVE EVER USED and would 100% use them again for any future moves." – Amanda P. from Charlotte, NC, May 8, 2017.

*See*, yelp.com.

15. In addition to generating business through its positive word-of-mouth and online reviews, Plaintiffs also spend approximately $65,000 per month to advertise globally on the Internet, such as on Facebook, Google, Angie's List, Yelp, and Instagram, among others.

16. Plaintiffs also run television commercials and advertise in traditional print media, such as AM New York, Metro New York, the Real Deal, and the New York Yankees' yearbook, among others.

17. Plaintiffs are also good corporate citizens and regularly contribute to numerous charities by, among other things, (i) sponsoring a Thanksgiving Turkey Donation Event for the past two Thanksgivings in which Plaintiffs purchased and delivered turkeys and grocery bags filled with fixings to 500 families in the Bronx for the Prodigal Center, a charity dedicated to feeding, clothing, and assisting those in need; (ii) sponsoring a Veterans and Military Family Holiday Event at the Bronx Zoo, in which Plaintiffs purchased toys for young children; (iii)

sponsoring The Children's Village Party at the Children's Aid Society since 2014, in which Plaintiffs contributed toys and gift cards for foster children; (iv) handling the logistics of delivery and storage for the cancer walk in Central Park; and (v) acquiring Veteran Movers NYC, a moving company dedicated to hiring veterans of the U.S. armed forces.

18. Roadway Moving has also been covered by the press in numerous widely-circulated publications, such as the New York Times, the Wall Street Journal, the New York Post, the Washington Post, the Associated Press, ABCNews.com, FoxBusiness.com, and the Jewish Voice, among others.

19. For instance, on April 4, 2018, Inman, a real estate trade publication, featured Roadway Moving's CEO, Ross Sapir, and reported that he grew Roadway Moving "from two trucks to 60," created "the top-ranked moving company in the New York metro area," and did it all "in less than a decade and before [his] 40th birthday."

20. Because of Plaintiffs' stellar reputation, rave reviews online, and effective marketing, Plaintiffs' sales have steadily increased every year since their inception. For instance, in the last three years alone, Plaintiffs' sales have increased from $12 million in 2015, to $14 million in 2016, to $17 million in 2017. Today, Plaintiffs employ over 200 people, all of whose livelihoods depend on the strength of Plaintiffs' brand.

21. As a result of all of the foregoing, Plaintiffs' Mark has become an indicator of source and associated with high quality, expert care, and exceptional customer service in the moving industry.

B.     **Fake Roadway's Willful Trademark Infringement**

22. Plaintiffs recently discovered that, on or about December 6, 2016, Defendant William Rodriguez formed Defendant Roadway Movers LLC, a Florida limited liability

company.

23. Defendants' entire business model is based on *stealing* Plaintiffs' Mark, reputation, and goodwill as an actual moving company.

24. Fake Roadway chose the name "Roadway Movers" (the "Infringing Mark") as it is virtually identical, and thus confusingly similar to, Plaintiffs' Mark, "Roadway Moving."

25. Indeed, the only difference is mere conjugation.

26. This was intentionally done to deceive consumers who move once every five to 10 years and are thus familiar with the moving company "Roadway" but may not be attuned to how it is conjugated.

27. Indeed, as detailed *infra*, and in the accompanying declarations of two of the countless consumers who were duped by Fake Roadway's confusingly similar Infringing Mark, Fake Roadway's willful trademark infringement and false advertising has caused, and continues to cause, actual confusion amongst consumers.

28. In addition to utilizing a nearly verbatim copy of Plaintiffs' Mark, Fake Roadway amplifies its deception by falsely representing on its website, rwmovers.com, that Plaintiffs' credentials and reputation—and the goodwill associated therewith—belong to Defendants.

29. For instance, Fake Roadway's website falsely claims that "[w]e've earned a 4.5 star rating at opinions.com and an A+ BBB rating":

**EXPERIENCE GREAT SERVICE**

We've earned a 4.5 star rating at epinions.com & an A+ BBB rating

30. However, Fake Roadway (*i.e.*, "Roadway Movers") actually has a **F rating** with the BBB, while it is *Plaintiffs* (Roadway Moving) that has an **A+ rating** with the BBB:



31. In fact, in the last ten years, Roadway Moving has had only two complaints with the U.S. Department of Transportation, and *zero* complaints with the New York State Department of Transportation.  By contrast, Fake Roadway already has five complaints in 2018 alone.

32. Similarly, compared to Plaintiffs' Five-Star Yelp rating, Fake Roadway has a one-star rating on Yelp (the lowest possible because Yelp does not allow zero-star reviews).

33. Examples of the reviews for Fake Roadway include:  "If you value your possessions and your sanity, don't do it.  When you call to complain, they will tell you. [sic] Your contract is with the people they hired not them. You need to call that company to complain."

34. Moreover, Fake Roadway's claim that it has a "4.5 star rating at opinions.com" is also *literally false* because <u>the website "opinions.com" does not even exist</u>.

35. Similarly, Fake Roadway's website <u>falsely</u> claims that they have "over 10 years of moving experience."

36. To the contrary, Fake Roadway in fact has a little more than *one year* of experience, not in moving, but rather in acting as a *broker* for moving companies, while it is *Plaintiffs* that have over 10 years of moving experience.

37. Upon learning of Fake Roadway's willful infringement of Plaintiffs' Mark, Plaintiffs conducted an investigation by having one of its employees, Natasha Felder, contact Fake Roadway posing as a potential consumer. In Ms. Felder's email correspondence with Fake Roadway, Fake Roadway actually used *Plaintiffs' Mark* "Roadway Moving" in the subject line of its emails. And, to further deceive consumers into believing that Fake Roadway is actually Plaintiffs, Fake Roadway even emailed Ms. Felder *Plaintiffs' own promotional materials*. Specifically, Fake Roadway emailed Ms. Felder (posing as a potential consumer) *Plaintiffs'* promotional article entitled "Stress Less: The Do's and Don'ts of Moving," in which *Plaintiffs'* CEO, Ross Sapir, is quoted and identified as the "founder and CEO of Roadway Moving."

C.   **Evidence of Actual Confusion**

38. Fake Roadway's willful trademark infringement and attempt to trade on Plaintiffs' goodwill has caused, and is continuing to cause, actual confusion amongst consumers and irreparable harm to Plaintiffs' Mark and reputation.

39. Exacerbating the damage Defendants are causing to Plaintiffs, Defendants' infringement is not only stealing away Plaintiffs' customers, but is also tarnishing Plaintiffs' Mark, reputation, and goodwill, given Defendants' deplorable service. Indeed, *Fake Roadway does not even operate a moving company* but is rather a mere "broker" for other moving companies.

40. By way of example, Plaintiffs submit herewith the declarations of two consumers who were duped by Fake Roadway into believing that they were hiring Plaintiffs' reputable

moving company, when they had actually hired Fake Roadway as a "broker" who arranged to have substandard moving companies perform the jobs.

      **i.**      **<u>Actual Confusion by Carol Caspe</u>**

41.      On or about January 3, 2018, Fake Roadway's use of its Infringing Mark and coopting of Plaintiffs' credentials caused one consumer, Carol Caspe, to incorrectly believe that she had hired Plaintiffs' legitimate moving company to perform her move.

42.      However, she was actually deceived by Defendants into hiring Fake Roadway, who—unbeknownst to Ms. Caspe—subcontracted the move away to some other third-party mover.

43.      As a result, Ms. Caspe's move was a disaster.[2]  <u>Throughout this ordeal, Ms. Caspe incorrectly believed that she was dealing with Plaintiffs and experiencing such awful service from Plaintiffs</u>.

44.      Still not realizing that she had actually hired ***Fake Roadway***, Ms. Caspe posted the following negative review on ***Plaintiffs'*** Yelp page:

---

[2] Specifically, (i) the movers arrived late; (ii) they had no idea they were supposed to pack Ms. Caspe's belongings and had to go to Home Depot in the middle of packing because they had run out of boxes; (iii) the house pack up took 14 hours, not the "couple of hours" Fake Roadway guaranteed; (iv) they damaged the front steps of her old home (which she was in the process of listing) by dropping her piano onto them and also damaged several of her things; (v) after Ms. Caspe's belongings were already on the truck, the movers demanded that Ms. Caspe pay them far in excess of the purportedly "binding" and "guaranteed" quote that Fake Roadway had provided; and (vi) rather than delivering and storing her belongings in Fake Roadway's alleged "private facility" in San Francisco (as they had promised) the designee movers brought her belongings to a storage facility in Las Vegas, Nevada—the opposite direction of Portland, where Ms. Caspe was moving, and refused to even schedule a date for her belongings to be delivered to her.  Throughout this entire ordeal, Defendants refused to respond to Ms. Caspe's calls or emails.



45. Almost immediately after Ms. Caspe posted her negative Yelp review, Plaintiffs' CEO, Ross Sapir, responded to the review and informed Ms. Caspe that she had ***not*** hired Plaintiffs at all, but rather had actually hired Fake Roadway, whose company is merely a ***broker*** for moving companies that is freeloading off of Roadway Moving's name and reputation.

46. Thereafter, Mr. Sapir intervened on Ms. Caspe's behalf with Fake Roadway's designee mover and arranged for Ms. Cape's belongings to be delivered the next day.

    **ii.**     <u>**Actual Confusion by Sandy Glover**</u>

47. In or about early February 2018, Fake Roadway's use of its Infringing Mark also caused another consumer, Sandy Glover, to mistakenly believe that she had hired Plaintiffs' legitimate moving company for her move from Florida to Henderson, Nevada, when in fact she had mistakenly contracted with Fake Roadway.

48. On the day of the move, February 22, 2018, the movers—who were from Unique Van Lines, not from Roadway Moving—(i) arrived ***four hours late***; (ii) brought Ms. Glover's belongings to Miami, Florida; (iii) took more than ***three weeks*** to deliver her possessions; (iv) held her belongings hostage by refusing to unload their truck unless she paid them an additional

$1,186; and (v) stole/lost several boxes of her property and damaged others.

49. Because Ms. Glover incorrectly believed that she had hired Roadway Moving, she tracked down the contact information for Roadway Moving's CEO, Ross Sapir, to complain about the terrible experience she had with her move.

50. Mr. Sapir investigated her complaint and informed her that she had not actually hired, or ever contacted, Roadway Moving.

51. That was the first time that Ms. Glover realized that she had actually hired Fake Roadway and that they were merely a broker posing as Roadway Moving.

### iii.  Online Review Showing Actual Confusion

52. In addition, on or about February 12, 2018, an anonymous reviewer who identified herself as Christa of Pompano Beach, Florida ("Christa") posted a review on a website called Consumer Affairs stating that she wanted to utilize Plaintiffs "because of their excellent reviews" but mistakenly reached out to, and contracted with, Fake Roadway believing it was Plaintiffs.

53. In light of the rampant consumer confusion Fake Roadway is causing, as discussed *supra*, injunctive relief is necessary to prevent further irreparable harm.

### FIRST CLAIM
### (False Designation of Origin/Unfair Competition, 15 U.S.C. § 1125(a))

54. Plaintiffs repeat and reallege the allegations contained in the prior paragraphs of the complaint as if fully set forth herein.

55. Defendants' offers to sell, sales, promotion and/or advertisement of, moving services through the use of the Infringing Mark, coupled with Defendants' coopting of Plaintiffs' accolades and credentials, in competition with Plaintiffs, violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

56. Plaintiffs' Mark is entitled to protection under both Federal law and common law.

57. Plaintiffs' Mark is inherently distinctive and has acquired substantial secondary meaning in the marketplace through Plaintiffs' extensive and continuous use, advertising, promotion and sales of services bearing Plaintiffs' Mark.

58. Through that extensive and continuous use, advertising, promotion and sales, Plaintiffs' Mark has become a well-known indicator of the origin and/or quality of Plaintiffs' moving services before Defendants began utilizing the Infringing Mark.

59. Defendants' use of the Infringing Mark and/or colorable imitations thereof constitutes a false designation of origin and/or unfair competition that is likely to cause—and indeed has already caused—consumer confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendants' moving services by creating the false and misleading impression that they are being offered by, or affiliated with, Plaintiffs.

60. Defendants' use of the Infringing Mark and/or colorable imitations thereof has caused, and unless enjoined, will continue to cause, substantial and irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law, including at least substantial and irreparable injury to Plaintiffs' goodwill and reputation.

61. As a result, Plaintiffs are entitled to injunctive relief.

62. Moreover, Defendants' acts have also caused substantial monetary damage to the value of the Plaintiffs' Mark and Plaintiffs' business operations, trade name, reputation and goodwill, the exact amount to be determined at trial but to include damages, trebled, Plaintiffs' lost profits and Defendants' illicitly earned profits, trebled, together with costs and reasonable attorney's fees.

## SECOND CLAIM
### (Common Law Trademark Infringement and Unfair Competition)

63. Plaintiffs repeat and reallege the allegations contained in the prior paragraphs of the complaint as if fully set forth herein.

64. Defendants have misappropriated the results of Plaintiffs' labor, skill and expenditures through fraud, deception and other tortious conduct.

65. Defendants have and continue to unfairly compete with Plaintiffs by improperly utilizing Plaintiffs' Mark to sell Defendants moving services.

66. Plaintiffs have suffered and will continue to suffer injury and irreparable harm as a result of Defendants' misappropriation and misuse of Plaintiffs' Mark.

67. Plaintiffs have no adequate remedy at law.

68. In addition, Defendants' acts have also caused substantial monetary damage to Plaintiffs and Plaintiffs' business operations, in an amount to be determined at trial.

## THIRD CLAIM
### (Unlawful and Deceptive Acts and Practices Under New York General Business Law § 349)

69. Plaintiffs repeat and reallege the allegations contained in the prior paragraphs of the complaint as if fully set forth herein.

70. Defendants' offers to sell, sales, distribution, promotion, or advertisement of Defendants' moving services, in competition with Plaintiffs, violates Section 349 of New York General Business Law.

71. Plaintiffs' Mark is entitled to protection under New York law.

72. Plaintiffs' Mark has a distinctive appearance that is non-functional, and has also acquired substantial secondary meaning in the marketplace through Plaintiffs' extensive and continuous use, advertising, promotion, and sales of moving services under Plaintiffs' Mark.

73.     Through that extensive and continuous use, advertising, promotion, and sales, Plaintiffs' Mark has become a well-known indicator of the origin of Plaintiffs' services before Defendants' unauthorized use.

74.     Defendants' use of the Infringing Mark and/or colorable imitations thereof, constitutes a deceptive act and/or practice in the conduct of Defendants' business, trade and/or commerce, and a false designation of origin and/or unfair competition that is likely to cause— and indeed has already caused—consumer confusion, mistake, or deception as to the origins, sponsorship, or approval of Defendants' moving services by creating the false and misleading impression that they are offered by, authorized by, or otherwise associated with Plaintiffs' moving services.

75.     Defendants' use of the Infringing Mark and/or colorable imitations thereof has caused, and unless enjoined, will continue to cause substantial and irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law, including at least substantial and irreparable injury to Plaintiffs' goodwill and reputation.

76.     As a result, Plaintiffs are entitled to injunctive relief.

77.     Moreover, Defendants' acts have also caused substantial monetary damage to the value of the Plaintiffs' Mark and Plaintiffs' business operations, trade name, reputation and goodwill, the exact amount to be determined at trial but to include Plaintiffs' lost profits and Defendants' illicitly-earned profits, and enhanced damages, together with costs and reasonable attorney's fees.

## FOURTH CLAIM
**(Unlawful and Deceptive Acts and Practices under New York General Business Law § 133)**

78.     Plaintiffs repeat and reallege the allegations contained in the prior paragraphs of the complaint as if fully set forth herein.

79. Defendants' offers to sell, sales, distribution, promotion, or advertisement of, moving services utilizing the Infringing Mark, in completion with Plaintiffs, violates Section 133 of New York General Business Law.

80. Plaintiffs' Mark is entitled to protection under New York law.

81. Plaintiffs' Mark has a distinctive appearance that is non-functional, and has also acquired substantial secondary meaning in the marketplace through Plaintiffs' extensive and continuous use, advertising, promotion, and sales.

82. Through that extensive and continuous use, advertising, promotion, and sales, Plaintiffs' Mark has become a well-known indicator of the origin of Plaintiffs' moving services before Defendants' unauthorized use.

83. Defendants' use of the Infringing Mark and/or colorable imitations thereof, constitutes a deceptive act and/or practice in the conduct of Defendants' business, trade and/or commerce, and a false designation of origin and/or unfair competition that is likely to cause consumer confusion, mistake, or deception as to the origin, sponsorship, or approval of the Defendants' moving services by creating the false and misleading impression that they are offered by, authorized by, or otherwise associated with Plaintiffs.

84. Defendants' use of the Infringing Mark and/or colorable imitations thereof has caused, and unless enjoined, will continue to cause substantial and irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law, including at least substantial and irreparable injury to Plaintiffs' goodwill and reputation.

85. Defendants' use of Plaintiffs' Mark and/or colorable imitations thereof has been intentional, willful, and with the intent to deceive and/or mislead the public as is evidenced by the identical nature of Plaintiffs' Infringing Mark when compared to Plaintiffs' Mark and

Defendants coopting of Plaintiffs' credentials and accolades.

     86.    As a result, Plaintiffs are entitled to injunctive relief.

**WHEREFORE**, Plaintiffs hereby request that this Court grant them the following relief:

i. an order permanently enjoining and restraining Defendants, their respective officers, agents, representatives, successors, assigns, affiliates, servants, employees, licensees, attorneys and all those acting in concert or in participation with Defendants from using, advertising, or selling moving services in connection with: (a) the name "Roadway Movers," (b) the word "Roadway," or (c) or any name or word confusingly similar to "Roadway";

ii. an order directing Defendants to immediately provide Plaintiffs with a detailed list of all sales and to whom such sales were made;

iii. on Plaintiffs' First Claim, an award against Defendants of actual damages and lost profits Plaintiffs suffered as a result of Defendants' acts, trebled, as well as an award of Defendants' profits improperly earned from their infringement of Plaintiffs' Mark, trebled;

iv. on Plaintiffs' Second Claim, an award against Defendants of damages in an amount to be determined at trial;

v. on Plaintiffs' Third Claim, an award against Defendants of damages in an amount to be determined at trial;

vi. an award of Plaintiffs' attorney's fees and costs;

vii. an award of prejudgment interest to the full extent permitted by law; and

viii. an award of such other and further relief as this Court may deem just, proper and equitable.

Dated: New York, New York
       May 9, 2018

By: _____
Darren Oved, Esq.
Aaron J. Solomon, Esq.
Michael Kwon, Esq.
OVED & OVED LLP
*Attorneys for Plaintiffs*
401 Greenwich Street
New York, New York 10013
Tel: 212.226.2376